1      **IN THE UNITED STATES DISTRICT COURT**
       **FOR THE WESTERN DISTRICT OF TEXAS**
2                 **AUSTIN DIVISION**

3   UNITED STATES OF AMERICA,           ) AU:22-M -00346(1)
                                        )
4      Plaintiff,                       )
                                        )
5   v.                                  ) AUSTIN, TEXAS
                                        )
6   JUAN IGNACIO SORIA GAMEZ,           )
                                        )
7      Defendant.                       ) APRIL 12, 2022

8      ***********************************************
       TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
9          BEFORE THE HONORABLE SUSAN HIGHTOWER
       ***********************************************
10
    APPEARANCES:
11
    FOR THE PLAINTIFF:   MARK MARSHALL
12                       UNITED STATES ATTORNEY'S OFFICE
                         903 SAN JACINTO BOULEVARD, SUITE 334
13                       AUSTIN, TEXAS 78701

14  FOR THE DEFENDANT:   CHARLOTTE ANNE HERRING
                         FEDERAL PUBLIC DEFENDER'S OFFICE
15                       504 LAVACA STREET, SUITE 960
                         AUSTIN, TEXAS 78701
16
    TRANSCRIBER:         ARLINDA RODRIGUEZ, CSR
17                       501 WEST 5TH STREET, SUITE 4152
                         AUSTIN, TEXAS 78701
18                       (512) 391-8791

19

20

21

22

23

24  Proceedings recorded by electronic sound recording, transcript

25  produced by computer.

**EXAMINATION INDEX**

SEAN FALLON
      DIRECT BY MR. MARSHALL . . . . . . . . . . . . . . . 4
      CROSS BY MS. HERRING  . . . . . . . . . . . . . . 23
      REDIRECT BY MR. MARSHALL . . . . . . . . . . . . 44

**EXHIBIT INDEX**

|            | OFFD | ADM |
|------------|------|-----|
| Government |      |     |
| 1-9        | 19   | 20  |
| 11-15      | 19   | 20  |
| 16         | 21   | 22  |

1      (Proceedings began at 2:02 p.m.)

2            THE COURT:  Thank you.  Please be seated.

3            THE CLERK:  Court is now in session for a preliminary

4  and detention tearing, 22-MJ-346, *United States v. Juan Ignacio*

5  *Soria Gamez*.

6            MR. MARSHALL:  Mark Marshall for the United States.

7            THE COURT:  Good afternoon, Mr. Marshall.

8            MR. MARSHALL:  Good afternoon.

9            MS. HERRING:  Charlotte Herring for Mr. Soria Gamez.

10           THE COURT:  Good afternoon, Ms. Herring.

11           And I understand that, as Mr. Ferrell stated, we're

12 proceeding with a preliminary and detention hearing today; is

13 that correct, sir?

14           MR. MARSHALL:  Yes, ma'am.

15           THE COURT:  Okay.  So I'll begin by reminding counsel

16 that, as required by Rule 5(f), the United States is ordered to

17 produce all exculpatory evidence to the defendant pursuant to

18 *Brady v. Maryland* and its progeny.  Not doing so in a timely

19 manner may result in sanctions, including exclusion of

20 evidence, adverse jury instructions, dismissal of charges, and

21 contempt proceedings.

22           So, with that admonition given, Mr. Marshall, you may

23 proceed.

24           MR. MARSHALL:  I'll call Sean Fallon.

25           THE COURT:  Mr. Fallon, if you'll come up here to the

 1  witness stand.

 2      (Witness sworn)

 3          THE COURT:  Thank you, Mr. Fallon.  You may be

 4  seated.  And, Mr. Marshall, you can proceed.

 5                          **SEAN FALLON,**

 6  having been first duly sworn, testified as follows:

 7                       **DIRECT EXAMINATION**

 8  **BY MR. MARSHALL:**

 9  Q.  Once you get set and situated there, go ahead and tell us

10  your name and spell your name for the record, please?

11  A.  My name is Detective Sean, S-e-a-n, Fallon, F-a-l-l-o-n.

12  Q.  How are you employed?

13  A.  I'm a member of the Cedar Park Organized Crime Unit, a

14  case-specific task force officer with the Austin DEA and TDS.

15  Q.  How long have you been with law enforcement agencies?

16  A.  Since 2014.

17  Q.  How long have you been working on this task force?

18  A.  Approximately the past two years.

19  Q.  What is the subject of this particular task force?

20  A.  Specifically tasked for pharmaceutical narcotics causing

21  overdoses in the Central Texas and Austin areas, mainly

22  focusing on fentanyl distribution.

23  Q.  In that regard, in or about 2021, did you have or receive

24  information that Juan Soria Gamez was involved in the

25  distribution of oxycodone -- counterfeit oxycodone?

1  A.    Yes, sir, we did.

2  Q.    What information did you receive?

3  A.    Leander Police Department reached out to us on our about

4  the 19th of March 2021.  They were investigating a fatal

5  overdose of an individual named Cameron Stewart.  He was found

6  deceased.  At that time family members of Mr. Stewart gave the

7  name of Juan Soria.  Detective Johnson with Leander Special

8  Investigations Unit was able to use the phone found with the

9  deceased to find a Cash App that was titled "Trap Star."

10 And after digging into that Snapchat, identified it fully as

11 Juan Soria Gamez.

12 Q.    So how did they tie the Cash App to this particular

13 distribution?

14 A.    All they had to go off of -- some of the information that

15 was provided by Cash App didn't have specifics other than the

16 name.  They were able to corroborate that later with a

17 confidential informant that reached out to them after Cameron's

18 passing.  An individual reached out who was a friend of Cameron

19 to Leander Police Department and stated he knew an individual

20 as Juan Soria.  The same individual that was -- came back on

21 the Cash App photographs were shown by Detective Johnson to

22 that confidential informant who identified him as being the

23 same person.  And that informant attempted to try to conduct

24 controlled purchases from Mr. Soria.

25 Q.    Do you have any evidence that this defendant, Mr. Gamez,

1  was aware of the fact that the dope he sold Cameron caused his

2  death?

3  A.    Mr. Soria did or was seen at Cameron Stewart's funeral.

4  Their relationship -- again, I don't want to speculate of how

5  well they knew each other.  But if he was purchasing from

6  Mr. Soria and then going to his funeral, that would be

7  indicative of that.

8  Q.    Was there any evidence or information given by his family

9  that indicated that Mr. Gamez was aware of that?

10 A.    Shortly after the funeral, there was a post -- I was not

11 present for the post, but it was provided by one of the family

12 members.  They showed a -- Mr. Juan posted a picture with a

13 handful of the M30 oxycodone tablets in his hand, and it said

14 "RIP.  We lost a good one."

15 Q.    Was that related to Cameron's death?

16 A.    Yes, sir.

17 Q.    After you got that information and you got a confidential

18 informant that came forward, what did you do with that

19 confidential informant?

20 A.    He was signed up through the Leander Police Department,

21 again, gave the information.  At the time Mr. Gamez was only

22 known as Juan Soria.  He was fully identified later by

23 detectives and was going to attempt to purchase the illicit

24 oxycodone to start putting a case on Mr. Gamez.

25 Q.    Was that successful?

1   A.   It was not.

2   Q.   Why not?

3   A.   On 9-23-21 Mr. Roe was found dead of an apparent overdose

4   at his residence at approximately 10:48 a.m. on the 23rd.  One

5   of the Cedar Park Organized Crime Unit members, Detective

6   Castillo, arrived on-scene that day and was able to secure

7   Mr. Roe's phone.  Subsequent to that, he subpoenaed Cash App

8   records on December 13th of '21 for the name Trap Star, which

9   was in Mr. Roe's recent transaction history on the Cash App.

10          On February 11th of '22, the Cash App -- we actually

11  received the return at that point, and the owner of the Cash

12  App for Trap Star was identified as Juan Ignacio Soria Gamez.

13  Q.   Same as the previous?

14  A.   Same as the previous.  This Snapchat return also contained

15  his date of birth of 7-20-2002, which is the same

16  Juan Soria Gamez we had identified, as well as showed the last

17  four of his social security number, which we were able to

18  confirm that with law enforcement databases as being the same

19  Juan Soria Gamez.

20  Q.   Were those particular transactions in that Cash App

21  related to the death of the second CI?

22  A.   They were.  The last Cash App transaction between Trap

23  Star, who was Mr. Gamez, and Mr. Roe was on September 23rd,

24  2021.  Approximately 10 hours and 32 minutes after that is when

25  he was found dead.  The transaction was for $68.  Tucker Roe's

1  Cash App name was Lickma.  The transaction clearly was shown on

2  the Cash App return between Trap Star and Lickma for the $68.

3          Also in the phone it showed that conversation between

4  Mr. Soria and Mr. Roe on Instagram when they discussed price.

5  Mr. Soria told Mr. Roe, "Hey, Cash App me," and then sent him

6  an address for him to meet at.  After that there was no

7  communication between the two.  And then, again, 10 hours and

8  32 minutes after this is when he was found dead.

9  Q.   And was that second CI Mr. Roe?

10 A.   Yes.

11 Q.   Did he have a coroner's inquest or ME report?

12 A.   Yes.  The ME report showed fentanyl and kratom.  We got

13 that back on September -- I'm sorry.  The autopsy was done

14 September 24th of 2021.  It showed the cause of death to be

15 drug toxicity of fentanyl and kratom.  Both were found in Roe's

16 system.

17         The amount of kratom was 25 nanograms.  The

18 recommended -- which is about 2.5 grams.  The recommended dose

19 for kratom is between 2 and 12 grams, so it was well under the

20 limit.  Kratom is a lot of times used for individuals who are

21 having opiate withdrawals to help subside those symptoms and is

22 a natural drug.  It derives from a plant in Asia.

23 Q.   That's actually not a controlled substance, is it?

24 A.   It is not.  No, sir.

25         So the amount of fentanyl that was in his system was

1   2. -- or 4.5 nanograms, which more than lethal in an individual

2   system.  The level of kratom that was found inside the body was

3   not a lethal amount.

4   Q.   All right.  Based on that, was there a conclusion as to

5   the cause of death?

6   A.   Without the fentanyl being in his system, it would --

7   there's no reason he should have overdosed and died.

8   Q.   Subsequent to that, were you able to continue your

9   investigation of Mr. Gamez's distribution activity?

10  A.   Yes.  We started cultivating confidential informants that

11  we knew had relationships with Mr. Soria or Mr. Gamez.  On 2-22

12  of '22, we were able to conduct our first controlled purchase

13  from Mr. Soria or Mr. Gamez.  At that time we only purchased

14  two tablets for the price of $75.  We did another controlled

15  purchase on March 1st of 2022.  That purchase we purchased five

16  tablets for $170.  Both of those lab results came back from the

17  DPS lab and shows positive results for fentanyl being in those.

18       We continued to conduct buys with Leander Police

19  Department, who also had a second confidential informant who

20  was able to buy from Mr. Gamez.  We conducted buys with them on

21  2-23 of '22, which was five tablets for $95; 3-2 of '22, which

22  was 10 1/2 tablets for $205; March 10th of '22, which was 10

23  tablets for $205; March 24th, '22 for 10 tablets for $200; and

24  April 6th of '22 for 10 tablets for $190.

25       All those are still pending DPS lab analysis.

1  Q.   The first two came back positive for fentanyl?

2  A.   Correct.

3  Q.   And, essentially, we have to wait until we get at least

4  one or two back before we can initiate an arrest based on this

5  kind of activity, correct?

6  A.   Yes, sir.

7  Q.   So after you made all those arrests and seized those

8  particular exhibits, what action did you take?

9  A.   We issued a state search warrant on Mr. Gamez's apartment,

10 located at 149 South Bagdad Road in Leander, Texas.  Myself,

11 Leander Police Department, and DEA agents conducted that search

12 warrant.

13 Q.   Who lived at that apartment?

14 A.   Mr. Gamez, another male -- I do not remember his name --

15 and his girlfriend.  Not Mr. Gamez's girlfriend, the other

16 male's girlfriend, was also staying there to how long and we

17 had constant 24-hour surveillance on that apartment, pole cams,

18 it was towards the better part of -- or end of March, early

19 April, is when they started staying there pretty frequently.

20 Q.   So you had pole cams up at the end of March and end of

21 April, correct?

22 A.   Correct.

23 Q.   Did you see any evidence that Mr. Gamez had a regular job?

24 A.   No, we did not.

25 Q.   Contrary to that, did you find evidence after the

1  execution of the warrant that his regular job was drug

2  distribution?

3  A.   Yes, sir.

4  Q.   Could you go ahead and tell us what happened when you

5  executed the warrant.

6  A.   During the search warrant, all occupants were detained.

7  We cleared the residence, conducted the search.  We found

8  six -- 17 grams of marijuana throughout the house, 5.7 grams of

9  the blue round pills, the fentanyl-laced oxycodone,

10 approximately 150 of the tablets.  They were found hidden in a

11 loose bedpost inside Mr. Gamez's bedroom, in his bed.  And then

12 approximately $3,361 in small denominations, everything from

13 one $1 bills, $5 bills, $10 bills, $20 bills, $50 bills, and

14 $100 bills, which is indicative of lower-level sales and

15 distribution.  Typically, those oxycodone pills are sold in low

16 quantity due to their being expensive, and so it's very average

17 to have lower denominations on search warrants such as this.

18 Q.   What are they going for per tablet?

19 A.   It varies.  The low end 8 to 10 dollars, the high end, 25

20 to 30 dollars, depending on the quantity, how many you buy.  If

21 you're buying a couple of pills at a time, the price is always

22 higher.  If you're buying them in large amounts or large

23 quantity, they're usually a little bit cheaper.

24          There was also 15.8 grams of psilocybin, or shrooms,

25 found inside the apartment.

1  Q.   Anything else of evidentiary value?

2  A.   There was a gun with a magazine.  We weren't able to

3  recover the gun itself.

4  Q.   You did recover the gun?

5  A.   We did not.  The -- the individual who was staying there

6  stated he believed Mr. Gamez had taken it to his parents' house

7  prior to that, because they were in the process of moving out

8  of the apartment.

9  Q.   Anything else?

10 A.   Not on that search warrant.  No, sir.

11 Q.   You're still processing the other evidence from that

12 warrant.  It was just recently run, wasn't it?

13 A.   Yes.  It was just -- it was on the -- a couple of -- like

14 a week ago.

15 Q.   The seventh?

16 A.   Yeah.  On the seventh, I believe.  Those are still being

17 processed.  All of that's been sent out to the DPS lab for

18 analysis.  We attempted to interview Mr. Gamez afterward.  We

19 explained to him why we were there.  A lot of the information

20 he was provided to us we knew to be untruthful.

21 Q.   Let's stop there.  Did you advise him of his

22 constitutional rights before he made his statement?

23 A.   Yes, sir.  He was read his Miranda rights prior to us

24 interviewing him.

25 Q.   Did he agree to make a statement?

1  A.   He did.

2  Q.   What did he tell you in specifics?

3  A.   He told us that he had sold THC products and marijuana,

4  and the oxy on occasion, he didn't do it regularly.  He told us

5  he would "middle" the deals, facilitate people that he knows

6  through another person who he did not identify to purchase the

7  pills.  We did confront him about the Cash App information

8  involving Mr. Roe and how everything pointed to him being the

9  one to distribute those fatal pills to Mr. Roe.  At that point

10 he again maintained that he was facilitating and he had no

11 involvement in that.

12 Q.   He was part of the transaction, but he facilitated and

13 didn't actually deliver it?

14 A.   According to him, yes, sir.

15 Q.   Anything else he had to say at that point?

16 A.   He did not.  During a preliminary phone dump of

17 Mr. Gamez's phone, it did show the address that he sent to

18 Mr. Roe the night of the transaction.  It was confirmed to be

19 in his phone's GPS, which put him at the same location where

20 those pills were to be delivered.

21 Q.   All right.  Did you seize that phone?

22 A.   We did.

23 Q.   Was the conversation with Mr. Gamez recorded?

24 A.   Yes.  All the transactions and buys that we conducted

25 throughout the investigation were all recorded.

1  Q.   Was his debrief or his statement post-Miranda recorded?

2  A.   Yes, it was.

3  Q.   Did you have a chance to look at the phone?

4  A.   We did not.  We gave it to our analyst to try to break

5  into that.  However, he did not provide us the pass code, so we

6  weren't able to get into that phone as of right now.

7  Q.   Were you able to get some Instagram and other electronic

8  communications during the investigation?

9  A.   Yes.  Throughout the investigation, multiple detectives

10 were monitoring his social media.  A lot of screenshots and CI

11 pictures and things like that were taken and recorded as

12 evidence.

13 Q.   And I'm going to show you in a moment what's been marked

14 as Government's Exhibits 1 through 15.  Do those contain the

15 Snapchats of messages sent by this defendant, Mr. Gamez?

16 A.   The Instagrams and things of that nature.  Yes, sir.

17          MR. MARSHALL:  May I approach?

18          THE COURT:  You may.

19 Q.   (BY MR. MARSHALL) I'm going to show you what's been marked

20 as 1 through 15.  You looked through them previously.  Are

21 those -- beginning with the second photo going through, are

22 those the Snapchat and Instagrams?

23 A.   Yes.

24 Q.   Okay.  The first photo on the left side of Government's

25 Exhibit 1 is what?

1  A.   That is the approximate 150 oxycodone tablets that we

2  found inside of the bedpost during the search warrant.

3  Q.   You've already referred to those in your testimony?

4  A.   Yes.

5  Q.   Okay.  Let's go through these.  What's depicted in the

6  photo on Government's Exhibit 1?

7  A.   This picture is Mr. Juan Soria Gamez on his balcony of his

8  apartment -- I know that because the leasing office is across

9  the way.  That's where his balcony faced -- with a firearm in

10  his hand that he is racking on the balcony in the evening.

11  Q.   Government's Exhibit 2?

12  A.   Again, his Instagram with another pistol in his hand and

13  him throwing an obscene gesture to the camera, as well as the

14  one on the right, another photo of a -- looks to be a Glock 43

15  pistol that he posted on his social media as well.

16  Q.   How old is Mr. Gamez?

17  A.   20 years old.

18  Q.   Could he legally purchase a pistol?

19  A.   No.

20  Q.   It says on this what?

21  A.   "big Day Tomorrow."

22  Q.   And that referred to?

23  A.   I'm unaware of what that --

24  Q.   All right.

25  A.   -- could be.

1  Q.   Government's 3?

2  A.   Again, same Instagram.  This an Instagram live video that

3  was screenshot-ed of an AR platform rifle that has being held

4  by Mr. Gamez.

5  Q.   Did you determine who owned that particular AR rifle?

6  A.   We have not, no.

7  Q.   Do you know where that is?

8  A.   We do not.

9  Q.   Government's Exhibit Number 4?

10 A.   The same Glock 43 that was posted before.  The words,

11 "Posted up in Leander, tap, tap, tap," and then an M-circle

12 emoji, which is indicative of the oxycodone m-boxes is what

13 they refer to them on the street.  They're a round pill with an

14 imprint of an "M" on one side and a "30" on the other, a THC

15 cartridge there on the bottom, and then the 9-millimeter

16 pistol.

17 Q.   And what was the rough time frame that these occurred?

18 A.   These were throughout the whole investigation.

19 Everything -- most of everything that is captured here in the

20 evidence is from after Mr. Stewart's death at some point.  So

21 late March to now.

22 Q.   So Mr. Stewart died, you tied it to this defendant, this

23 defendant went to his funeral, and he's still doing this?

24 A.   Yes.

25 Q.   Now Mr. Roe dies, we start looking at him again, and all

1  this occurs after that?

2  A.    Correct.

3  Q.    Government's Exhibit Number 4?

4  A.    Another post on Instagram.  It says, "Been sleeping all

5  day.  Literally just woke up.  Tap, tap, tap."  Typically that

6  refers to, if you miss some messages about people wanting to

7  buy and you hit the tap, that means the shop is open,

8  essentially.

9  Q.    I'm sorry.  That was 5.

10  A.    Yes.

11  Q.    Government's 6?

12  A.    Another few Instagram photos of Mr. Gamez with his pistol,

13  this unidentified male with his face covering, and then appears

14  that he's smoking a blunt or marijuana cigar in that picture.

15  Q.    Number 7?

16  A.    Another post by Mr. Gamez.  It states, "The feds are on my

17  ass, but I still getting money, and that's no kizzy."  This was

18  taken after -- again, after Mr. Stewart was sound deceased up

19  until now.

20  Q.    So after two people are dead, and apparently knows they're

21  dead, he thinks the feds are on his ass, as he says, and he's

22  still selling?

23  A.    It would appear that way.  Yes, sir.

24  Q.    Government's Exhibit 8?

25  A.    Another Instagram live video.  My "Shit finally came in."

1  Typically that is referring to whenever someone re-ups and

2  they're back up in their narcotics, they will post that to let

3  everybody know that they have what they're looking for.

4          THE COURT:  Let me just mention, Detective Fallon, I

5  can mostly hear you, but just make sure you're speaking up a

6  little bit.

7          THE WITNESS:  Yes, ma'am.

8  Q.   (BY MR. MARSHALL) Government's 9?

9  A.   "New stick for tha cribbo" with Mr. Soria or Mr. Gamez

10 with a pistol pointed at the camera.  A stick is a common

11 street term for a firearm.  So he's saying it's a new firearm

12 for his house.

13 Q.   Number 10?

14 A.   I believe this is the same one.

15 Q.   The same one?

16 A.   Yeah.

17         MR. MARSHALL:  I'll remove 10.  It's a duplicate.

18 Q.   Number 11?

19 A.   Another photo from Instagram.  This time it's depicting a

20 THC concentrate.  Typically we call that "wax" or "dab."

21 Q.   Number 12?

22 A.   Number 12 is a close-up of Mr. Gamez's face, stating "Pack

23 is always in" with the "m-box" emoji again.  "Doing good

24 numbers.  Just let me know your tag."  That means that -- the

25 pack is referring to the pack of the pills that he's selling,

1   saying he has them in stock, and that he's doing good numbers,

2   as in doing good prices.  So to hit him up if you'd like to

3   purchase.

4   Q.   Again, well after your investigation began?

5   A.   Yes.

6   Q.   Number 13?

7   A.   Another picture of THC concentrates, stating "Always got

8   it tap" with the "m-box."  So he's now marketing the THC

9   concentrates as well as the oxycodones and that he has both for

10  sale.

11  Q.   Number 14?

12  A.   Number 14, a picture of a marijuana water bong, a device

13  used for smoking marijuana.  "Always got it, tap in," with

14  another M-circle emoji, indicating the oxycodone tablets.

15  Q.   And, finally, Number 15?

16  A.   Fifteen appears he's inside of a vehicle.  It says "Packs

17  landed right now," again, indicating that he just re-upped on

18  his narcotics.  "Catch me in traffic."  "Tap in tomorrow unless

19  it's $100-plus because I'm pulling up on my fam tonight."

20          Typically, that means hit me now while I'm driving

21  around.  I can drop off to you, make deliveries to you,

22  essentially, and that he can't later because he'll be with his

23  family.

24          MR. MARSHALL:  I'm going to move to admit 1 through 9

25  and 11 through 15.

1          THE COURT:  Any objection?

2          MS. HERRING:  Your Honor, I don't -- I believe the

3  Court can consider them, but we're not going to concede that

4  they came from -- I'm not going to concede that they came from

5  my client's phone.  But I think the Court can consider them as

6  part of something the detective has reviewed.

7          THE COURT:  Thank you, Ms. Herring.  The exhibits are

8  admitted.

9  Q.   (BY MR. MARSHALL) And how did you establish they came from

10 the defendant's phone?

11 A.   Those were posted from his social media.  They were

12 captured from his posts.  So whatever device he was using that

13 was capable of taking those pictures and posting them is what

14 we were capturing.

15 Q.   And you identified those posts as belonging to this

16 defendant?

17 A.   Yes, sir.  He was both seen physically in the posts, as

18 well as the name was concurrent -- the same one that we were

19 using by ourselves and confidential informants to communicate

20 with Mr. Gamez.

21 Q.   Correct me if I'm wrong, but when you interviewed him

22 after he was arrested and advised of his constitutional rights,

23 it was at your station and it was videotaped, correct?

24 A.   Correct.  At the Leander Police Department.

25 Q.   Talked to him about the death and the other witnesses?

1  A.    Correct.

2  Q.    Did he appear to take any of this seriously?

3  A.    No.  There was a lot of "It wasn't me.  I facilitated.  It

4  was somebody else."  However, he would not provide us the

5  information of this other person that he spoke of.  We

6  attempted that conversation for approximately an hour, maybe a

7  little longer.  Still nothing.  At which point we told him we

8  were done with the investigation and a patrol officer was

9  brought in to place him in handcuffs.

10  Q.    Did you take a standard photo of him as you were

11  interviewing him?

12  A.    Yes.  We attempted to take a few photos, but Mr. Gamez

13  kept smiling during the photos.  So that was kind of the best

14  one we were able to get.

15  Q.    I"m showing you Government's Exhibit 16.  Is that one of

16  those photos?

17  A.    Yes.  That was after the interview and the officer was

18  taking him into custody for transport to the marshals.

19  Q.    Does that pretty much capture his affect during the

20  interview?

21  A.    Yes, sir.

22        MR. MARSHALL:  Move to admit 16, Your Honor.

23        THE COURT:  Any objection?

24        MS. HERRING:  Your Honor, I don't have an objection

25  to the photo.

1          THE COURT:  Okay.  Thank you.

2          MS. HERRING:  The conclusion being drawn, again, we

3   don't concede.

4          THE COURT:  Thank you once again, Ms. Herring.

5          Exhibit 16 of the government is also admitted into

6   evidence.

7   Q.   (BY MR. MARSHALL) After the interview was completed, what

8   did you-all do?

9   A.   Mr. Gamez was transported to -- downtown here to the

10  marshal custody, where he was released.  We then processed the

11  evidence and began putting everything together.

12  Q.   Were you able to connect this defendant's distribution

13  activities to any other overdoses.

14  A.   Loosely, yes.  We had our -- Llano PD on 11-23 of '21 had

15  an individual overdose.  He was stabilized by EMS.  They

16  Narcan-ed him on-scene and were able to counteract the opioid

17  effects and transport him to the hospital.  Detective David

18  Wilson from Leander responded to speak with this individual.

19  He asked him where the pills came from, and he stated an

20  individual he knows as Juan Soria.  No further cooperation did

21  he wish to give other than the name, and he was subsequently

22  left at the hospital for treatment.

23  Q.   Still working on that one?

24  A.   Yes.

25  Q.   Any others?

 1  A.   And then Monday of this week, another confidential

 2  informant informed us that in April of 2021 he purchased

 3  oxycodone tablets from Mr. Gamez, overdosed, was taken to the

 4  hospital, Cedar Park Regional, by his friends.  He was treated,

 5  and he did inform me that there was no police or EMS that

 6  responded to that call.  And we're in the process of trying to

 7  get that subpoenaed or some kind of records from Cedar Park

 8  Regional.

 9           MR. MARSHALL:  I'll pass the witness.

10           THE COURT:  Thank you.  Ms. Herring?

11           MS. HERRING:  Yes, Your Honor.  Thank you.

12                     **CROSS-EXAMINATION**

13  **BY MS. HERRING:**

14  Q.   So, Detective Fallon, I want to go back to when you began

15  investigating my client, Mr. Soria Gamez.  Was it Leander

16  Police Department that was the first agency to come across his

17  name?

18  A.   Yes, ma'am.

19  Q.   And that was back in, I think you said, March of 2021?

20  A.   Yes.  March '19th of '21.

21  Q.   And that was in response to a death investigation of

22  Cameron Stewart?

23  A.   Yes, ma'am.

24  Q.   And Leander Police Department interviewed Mr. Stewart's

25  mother, right?

1  A.    Correct.

2  Q.    And she is the person who identified Mr. Soria Gamez as

3  the possible source of the Percocets, right?

4  A.    To -- from what Leander's report says, yes, ma'am.

5  Q.    And you weren't part of the investigation at that time?

6  A.    We were informed afterward.  We worked very closely with

7  Leander, as they're our neighboring city.  So typically when

8  something like this goes off, we come and work it conjointly.

9  Q.    So that was the first time Mr. Soria Gamez's name

10  surfaced, was over a year ago or about a year ago?

11  A.    Yes, ma'am.

12  Q.    And Leander PD or any other law enforcement agency did not

13  arrest him back in March of 2021?

14  A.    No, ma'am.  There wasn't enough evidence to get an arrest

15  warrant at that time.

16  Q.    Then we -- I think you kind of fast-forward to August of

17  2021, when -- is it Mr. Roe, Tucker Roe, meets with a Leander

18  sergeant?

19  A.    Yes.  August 3rd of '21.  Yes, ma'am.

20  Q.    And you said -- I think the words you used were Mr. Roe

21  came forward.  What does that mean?

22  A.    So, according to Sergeant [unintelligible] with Leander,

23  Mr. Roe was friends with Mr. Stewart.  After Mr. Stewart passed

24  away, Mr. Roe went to Leander Police Department in an attempt

25  to try to cooperate or help law enforcement in dealing with

1  Mr. Gamez.

2  Q.   And, to your knowledge, there was no other reason for his

3  cooperation?  No monetary benefit to him?

4  A.   I do not know.  Typically, at least speaking personally,

5  whenever we have someone that approaches us, we do do monetary.

6  But Mr. Roe was not working off any charges or anything like

7  that.

8  Q.   And you're not sure whether he was receiving --

9  A.   Yeah.  I can't speak to that.

10  Q.   -- a monetary benefit?

11  A.   Yes, ma'am.

12  Q.   I think he -- one of the reports says that he, Mr. Roe,

13  identified Mr. Soria Gamez from a driver's license photo.  Is

14  that your recollection?

15  A.   According to the Leander report, yes, ma'am.

16  Q.   And then before Mr. Roe was able to really assist Leander

17  PD, he overdoses, right?

18  A.   Yes, ma'am.

19  Q.   And at that point no law enforcement agency arrests

20  Mr. Soria Gamez?

21  A.   No, ma'am.  Again, we need to build a case and find

22  evidence of this being correct other than just word of mouth.

23  Q.   In November 2021, Leander PD responded to another overdose

24  call; is that right?

25  A.   Is that the November 23rd?

1   Q.   I believe so.  Mr. McFall?

2   A.   Yes.

3   Q.   And that was the person you mentioned overdosed but was

4   stabilized?

5   A.   Yes.  Was transported to the hospital, and then detectives

6   went and spoke with him there.  And he's the one that gave

7   Mr. Gamez's name.

8   Q.   But then refused to cooperate further?

9   A.   Correct.

10  Q.   And Mr. Soria Gamez was not arrested following that

11  incident?

12  A.   Again, we didn't have anything to charge him with at that

13  point.

14  Q.   But you had three what you believe to be overdoses from

15  drugs that you believe Mr. Soria Gamez had sold?

16  A.   Correct.  So at that point we had reasonable suspicion but

17  not probable cause to complete an arrest affidavit for

18  Mr. Gamez.

19  Q.   In all of these reported overdoses that you believe are

20  linked to Mr. Soria Gamez, the young men believed they were

21  purchasing Percocets, right?

22  A.   It varies.  I can't speak to exactly what they knew they

23  were purchasing.  Percocets on the streets is a street term for

24  oxycodone.  Almost every investigation that we deal with it,

25  they refer to them as "percs," "yerks," "Percocets," "blues,"

1  "blue jeans," "blueberries."  There's a million names for it.

2          Percocet and oxycodone are different.  Percocets are

3  generic versions of the oxycodone tablet, obviously.  But

4  neither one of them contain fentanyl.  And in these cases and

5  these autopsies and in these drug findings, it showed the

6  presence of fentanyl in it.  So neither one of them were

7  obviously what they were marketed as.

8  Q.   But the families or the parents, for example, that Leander

9  police interviewed thought their sons were struggling with

10 addiction to Percocets or oxycodone?

11 A.   I can't speak to that.  I didn't interview or speak with

12 any of the family.  That was Leander that spoke with them.  And

13 then Detective Castillo is the one that spoke to Mr. Roe's

14 family the night of that overdose.

15 Q.   You haven't reviewed those reports?

16 A.   I read the reports, yes, ma'am.  I just haven't spoke to

17 them personally.

18 Q.   Do you have any recollection of the families saying they

19 thought their sons were out there trying to purchase fentanyl?

20 A.   No.  Not fentanyl, no.

21 Q.   And I think you just explained it, but Percocet is just a

22 brand name for oxycodone, right?

23 A.   Yes, ma'am.

24 Q.   And Percocets/oxycodone is a prescription pain reliever?

25 A.   Correct.

1  Q.   It's an opioid?

2  A.   Yes.

3  Q.   So if someone goes out to buy Percocet or is prescribed

4  Percocet, it doesn't mean that they are seeking to buy

5  fentanyl?

6  A.    No.  In some cases it is.  I've had individuals who

7  personally seek out fentanyl-laced oxycodone because that

8  addiction is actually stronger than the ones that are found in

9  Percocets and oxycodone.

10 Q.    Traditional pharmaceutical oxycodone doesn't contain

11 fentanyl, right?

12 A.    Correct.  It does not.

13 Q.    And the DEA has been finding, and I think that's why

14 you're on this specialized task force, that pressed pills being

15 marketed and marked as M30s, as oxycodone, are actually laced

16 with fentanyl?

17 A.    Correct.

18 Q.    So those are fraudulent Percocets?

19 A.    Yes.

20 Q.    Someone selling what looks like a Percocet or an oxycodone

21 may not know that it's laced with fentanyl, right?

22 A.    Correct.  That happens often.  That's why there's such a

23 big push in the media to try to put that out there for

24 individuals, and it's very hard to come across that not being

25 shown somewhere at some point nowadays.

1  Q.   So there's nothing on the pill itself that indicates that

2  it's been laced with fentanyl?

3  A.   Sometimes you can tell a little bit, not quite for

4  fentanyl.  But there's a difference between a pharmaceutical

5  manufactured tablet and one that's made in a pill press.

6           During the years of these investigations, they've

7  progressively gotten better, to look more like an actual

8  pharmaceutical tablet.  But some of lower-end pills, or ones

9  that aren't made or pressed as well, do have very noticeable

10 deficiencies, such as the sizing being off, the stamps not

11 matching, the texture is falling apart, tastes have been

12 described as being different between the two.  Things of that

13 nature.

14 Q.   And that's something you've learned because you've worked

15 a lot of these cases at this point?

16 A.   Yes.  A lot of it has either been taught to me from

17 first-hand experience or from cooperating defendants, users,

18 people who have those addiction problems, because we obviously

19 ask those questions on how you know, and they can tell the

20 difference between the pills on which ones they like and which

21 ones they don't, et cetera.

22 Q.   I think you testified that, on many of these controlled

23 buys, the lab results are still pending; is that correct?

24 A.   Correct.  I believe there was six buys or seven buys.

25 We've gotten lab results back on two of them thus far.

1  Q.   But in all of the controlled buys, you do I think what you

2  call a field test; is that --

3  A.   Yes.

4  Q.   -- is that correct?

5  A.   Correct.

6  Q.   And can you explain the purpose of doing a field test.

7  A.   So at first when we first start these investigations, on

8  the presumptive field test we're pretty confident as leading to

9  the lab results being the same.  We've noticed that, since this

10  fentanyl has kind of become a newer thing in the community and

11  with law enforcement I guess the past few years, some test kits

12  work different than others.  We've tried multiple, different

13  kinds and ways to do it.  Some work better than others.

14          So, as a standard practice, we always field test it

15  to see and then, obviously, to know how we package it while

16  we're working with it.  There is a different transition between

17  certain pills that are -- have higher concentrations of

18  fentanyl will react quicker, so we know to be more careful with

19  those pills.  Some show inconclusive results, where the color

20  doesn't change and then we get them back from the laboratory

21  saying it is fentanyl or carfentanyl, which does not show up

22  inside of the fentanyl reactant kits.  So it varies across the

23  board.

24  Q.   And how do you document the field tests that you do?

25  A.   Typically they're done either on body camera.  I know

1  Leander does most of theirs inside of the evidence room, which

2  is monitored with a camera inside of there.  And then sometimes

3  it's just documented on our reports.

4  Q.   And so if it's recorded like -- it sounds like Leander

5  Police Department would have those maintained as part of the

6  evidence in this case?

7  A.   Yes.  I believe everything inside their evidence room is

8  recorded.  I don't want to speak 100 percent to that because I

9  don't work for them, but it's reasonable to believe it should

10  be, yes.

11  Q.   Now, you had some of the pills purchased in the controlled

12  buys that did not test positive for fentanyl when you did the

13  field test in this case?

14  A.   Correct.  We had a couple that did not and a couple that

15  did.

16  Q.   And was it the -- I think it was a March purchases that

17  did not test positive for fentanyl in the field?

18  A.   I don't recall 100 percent off the top of my head which

19  ones.  I do know there was a couple.  There was also a couple

20  that Leander PD tested.  I've been working these cases a lot

21  longer than they have and have kind of figured out a better

22  way, I guess, if that makes sense, to test these.

23        A lot of times, like, when we first started these

24  cases, we would just take a piece of the pill and drop it in

25  there and would almost never get a positive result because the

1  binding agent actually covers the power on the side of the

2  pill, so the chemicals inside of the reactant kit do not

3  penetrate that to make a reaction, which is what Leander was

4  doing at the first part of this.

5          And when I was having them pop positive and they were

6  not, I explained that it's better to crush the pills up in a

7  powder on a piece of paper, put the powder inside of the test

8  kit to allow the full penetration from the chemicals inside the

9  reactant.

10 Q.   Do you remember being involved in the field testing on the

11 March 10th purchase?  I believe that was you and Detective

12 Castillo from Cedar Park?

13 A.   I do not -- was it a Leander buy or our buy?

14 Q.   Leander PD and Detective Fallon and Detective Castillo.

15 A.   Yes.  We went with them on some.  But the initial report,

16 if it was theirs, we were only present for the March 6th test,

17 at least myself.  And then the two tests that we did I was

18 present for.  I was not there for the other ones, no, ma'am.

19 Q.   You yourself were present at at least one where no

20 fentanyl came back on the field test?

21 A.   Yes.

22 Q.   A few just brief additional questions about Tucker Roe's

23 involvement with Leander Police Department, if you know.

24          As someone cooperating with Leander police

25 department, would part of his agreement have been to not

1  continue to use illegal controlled substances?

2  A.    I know in ours it is, yes, ma'am.

3  Q.    Is that a standard provision --

4  A.    I hope so.

5  Q.    -- for someone who is cooperating?

6  A.    I haven't read theirs, so I really don't know.  So I don't

7  want to speak to how they do their work.  Again, they are a

8  newer unit; they've only been around a couple of years.  But,

9  typically, yes, that's what we see most of the time.

10  Q.    Do you know if the Percocets that he's alleged to have

11  purchased from Mr. Soria Gamez on the 23rd of September that

12  resulted in the -- his death, was that part of a controlled buy

13  that he was instructed to do from Leander Police Department?

14  A.    They never conducted a controlled buy with Mr. Roe.

15  Q.    You've -- it sounds like, from a summary that I received

16  this morning that I think you prepared, you have reviewed the

17  autopsy report --

18  A.    Yes, ma'am.

19  Q.    -- in this case?

20         It was conducted by Dr. Chundru; is that right?

21  A.    Yeah.  I'm not sure how to pronounce it, but yes, ma'am.

22  Q.    Was that autopsy conducted at the direction of law

23  enforcement?  Do you know?

24  A.    Typically it is the JP or the on-call judge that orders

25  the autopsies.

1  Q.   And you mentioned that fentanyl and kratom were found in

2  his system?

3  A.   Correct.

4  Q.   So I haven't seen that report, so I'm just going to ask

5  you what you can remember from it.

6  A.   It's got the -- the actual name of kratom, which I can't

7  pronounce.  It's like Mitragyna I believe is how it's

8  pronounced, but it's kratom.

9  Q.   And there's a mention in your summary.  It says kratom is

10 used for medicinal purposes.  You're aware that the FDA has not

11 approved kratom for any medicinal use in the United States,

12 right?

13 A.   No, it has not.  The FDA typically doesn't approve a lot

14 of things like that, such as workout supplements, proteins, and

15 things like that.  They're very rarely FDA approved for the

16 reasons they can't control what's going into them.

17 Q.   And you're aware that kratom is an addictive substance as

18 well?

19 A.   It can be.  Yes, ma'am.

20 Q.   And the DEA in fact lists kratom on its website as a drug

21 and chemical of concern for the DEA even though it's not a

22 controlled substance?

23 A.   Yes, ma'am.  It is growing in more and more popularity.

24 Again, a lot of times we see it with people who have opiate

25 addiction problems as a way to try to wean themselves off

1  without purchasing illegal drugs.  That's the most common

2  practice of how we see that, at least nowadays.

3  Q.   And the DEA has initiatives to prosecute people who ship

4  kratom across state lines, right, because it's not legal to

5  ship it?

6  A.   I know they -- I don't know the final on that.  I know

7  they have talked about it, but I'm not well versed enough on

8  what their deciding factors of that is, so ...

9  Q.   You mentioned the amount of kratom found in Mr. Roe's

10  system.  Do you recall or did you see in the report the amount

11  of fentanyl?

12  A.   It was 4.5 nanograms, I believe.  I did not write that

13  down, so I don't remember exactly.  But I'm pretty confident

14  saying that's what it was.

15  Q.   And I think you had testified on direct that there was,

16  but for the fentanyl, there was no reason to believe that

17  Mr. Roe should have overdosed and died.  That's not a medical

18  opinion you're offering, right?

19  A.   No.  So the medical -- or the autopsy only shows

20  guidelines on that, on what they believe is fatal or not, but

21  they don't offer a specific quote, if that makes sense.

22  Q.   And you're not a doctor, right?

23  A.   I am not a doctor.  No, ma'am.

24  Q.   And you're not aware of Tucker Roe's medical history other

25  than what you've seen in the autopsy?

1  A.  Other than what I've seen, no, ma'am.

2  Q.  And you don't know his specific history of drug use and

3  drug addiction?

4  A.  Not specifics.  No, ma'am.  Nothing that was prior to the

5  investigations.

6  Q.  Aside from the confidential informants you've talked

7  about, or the individuals who were cooperating with Leander,

8  you worked with one specific cooperating source; is that right?

9  A.  So there was multiple used in this investigation.  Leander

10  Police Department had one, we he had one, and then I had

11  another one come forward, but he did not directly participate

12  in this investigation.  He just mentioned that while we were

13  talking about something else.

14  Q.  So I want to ask about the individual that you

15  specifically worked with, as in Cedar Park worked with, leaving

16  aside the Leander cooperators for a minute.

17         That individual was cooperating to work off pending

18  criminal charges, right?

19  A.  He was not.  No, ma'am.

20  Q.  He had pending criminal charges.  I mean, were you aware

21  of that?

22  A.  We had no charges on the individual we were using.

23  Q.  He hadn't been arrested by Cedar Park on a warrant out of

24  a different county?

25  A.  That, I don't -- I'm not aware of that.

1  Q.   Are you aware of that individual's criminal history?

2  A.   Yes.

3  Q.   So he had a criminal history?

4  A.   Yes.  He had a criminal history.  Yes, ma'am.

5  Q.   You're just not aware if he had pending charges?

6  A.   I don't know the specifics of his criminal history.  No,

7  ma'am.

8  Q.   Were you aware he was out on bond?

9  A.   Yes.

10 Q.   So an individual who had criminal history had pending

11 charges because he's out on bond?

12 A.   Right.  Just not through Cedar Park.

13 Q.   Was someone you felt was trustworthy enough to work with?

14 A.   Yes, ma'am.  So we spoke with the agency that was

15 responsible for that.  Very rarely is it that we have any

16 cooperating informants or sources of any nature that don't have

17 some kind of criminal history.  We take that into consideration

18 on a case-by-case value.  But, again, very rarely does people

19 who want to cooperate with law enforcement have an absolutely

20 zero or clean record.

21 Q.   Were you aware he had been arrested while out on bond,

22 released on bond again, and re-arrested?

23 A.   I don't know the specifics of that.  I just know he was

24 out on bond because we did speak to that agency prior to having

25 him cooperate with us.  But the circumstances involving it,

1  I -- I didn't have anything to do with those.

2  Q.   You found him to be a trustworthy cooperator?

3  A.   So, typically, whenever we sign up an informant or

4  confidential source of any type, we have them do what's called

5  a qualification buy -- typically it's involving somebody

6  completely different than our target -- to see if they are

7  credible and reliable and can do what they're said to be doing.

8  And through the course of this investigation, they proved to

9  be.

10 Q.   But, in your experience, it's possible for someone with

11 pending criminal charges to be out on bond and to work with law

12 enforcement and show up when they're supposed to?

13 A.   Yes, ma'am.  Anything's possible.

14 Q.   You did review Mr. Soria Gamez's criminal history as part

15 of this investigation, right?

16 A.   Yes.

17 Q.   You're aware that he has none?

18 A.   Correct.

19 Q.   Never been arrested before?

20 A.   Correct.

21 Q.   Jumping to the social media posts that you described for

22 the Court, I just want to make sure I understand the source of

23 those photos?  Those photos didn't come from Mr. Soria Gamez's

24 physical phone?

25 A.   No, ma'am.

1  Q.   Were they screenshots taken by third parties or by law

2  enforcement?

3  A.   It's an accumulation of everything.  So some were from

4  confidential informants, some was from officers acting in

5  undercover capacities, things of that nature.

6  Q.   Did you take any of the photos that you just reviewed?

7  A.   I personally did not.  No, ma'am.  That was other members

8  of my team.

9  Q.   And when I -- I just saw them briefly before the Court --

10  before they were presented to the Court.  But they didn't

11  appear to have dates on them.

12  A.   No.  Typically the stories like that, when they're posted

13  on social media, don't contain the date.  They just have the

14  hours and the time of when they're posted.

15  Q.   So you don't know sitting there today after your review

16  when those were made, when those snaps were published?

17  A.   Just from when we started monitoring the social media

18  until the conclusion of when he was arrested.  So it would be

19  in that time frame.  But the actual specifics, no, ma'am.

20  Q.   So sometime during the course of that year --

21  A.   Yes.

22  Q.   -- that this investigation has been going on?

23  A.   And we used markers, like some of them that were taken

24  after this incident or after this incident, so we can kind of

25  narrow down the time frame.  But it is between those -- the

1   months of the investigation to now.

2   Q.   Have you as part of this investigation either gotten a

3   warrant for or subpoenaed Instagram to get the records directly

4   from Instagram?

5   A.   Instagram, no.  I have in the past.  Instagram and

6   Snapchat are very hard to get attainable information from.

7   They also -- their time frame is very extended, which is why we

8   went the Cash App route to get specific information instead.

9   But, in my experience as an investigator, a lot of those don't

10  provide much information, if any at all, and the time frame is

11  never consistent.

12  Q.   The firearms that appear in some of the photos, I think

13  you said none of those firearms were found in the apartment

14  when the search warrant was executed?

15  A.   Correct.  Just a magazine.

16  Q.   The warrant -- were you present on the day the warrant was

17  executed?

18  A.   Yes, ma'am.

19  Q.   And that was a warrant where law enforcement knocked and

20  announced and then --

21  A.   Yes, ma'am.

22  Q.   -- asked for the door to be opened?

23  A.   Yes, ma'am.

24  Q.   And it was Mr. Soria Gamez himself who opened the door,

25  right?

1  A.   Correct.

2  Q.   And I believe the report says he was detained without

3  incident.  Is that your recollection?

4  A.   Yeah.  So we had a plain clothes officer posing as a

5  maintenance knock on the door, said it was maintenance.  And

6  then once he answered the door, he hesitated for a brief

7  moment, which is understandable.  There's a lot of people at

8  the door.  And then he exited, was placed in handcuffs, and we

9  cleared the rest of the house.

10  Q.   So he didn't take off, run, any of that?

11  A.   He did not.  He was asked if there was anybody else inside

12  of the apartment.  He told us no.  And then when we cleared the

13  apartment, we found the other two individuals.  That was a

14  little bit of a surprise.

15  Q.   So there was the -- I think you said was it the roommate,

16  Devin Gaona?

17  A.   Yes.  At least he'd been staying there within the past

18  month or so, or a few weeks, according to Leander detectives.

19  Mr. Gamez said in the interview, I believe, he was paying

20  partial to stay there.  But I don't -- we never had any direct

21  involvings with him or dealings with him other than that day.

22  Or I didn't.

23  Q.   Was he present during any of the controlled buys, to your

24  knowledge?

25  A.   To my knowledge, I don't know.  Leander Police Department

1 is the one that had access to the camera that was set up in the

2 hallway. They did know there was another individual, multiple

3 individuals, that would come and go from that apartment quite

4 frequently, as well as females. But not all of them were

5 identified.

6 Q. And on the day the warrant was executed, there was also

7 Katelyn Matthews and another young man; is that right?

8 A. I believe there was just Mr. Gamez, one other man, and

9 then the female. That was it. So it was just three people.

10 Q. Three people total?

11 A. Yes, ma'am.

12 Q. And those other two individuals were released?

13 A. Yes. They were said to be staying in the guest room, and

14 the only thing located in there, I believe, was marijuana. And

15 they were both released on the scene.

16 Q. Were they interviewed by law enforcement?

17 A. So after the execution of the search warrant, myself, my

18 sergeant, and two other DEA agents transported Mr. Gamez to the

19 Leander Police Department while Leander and some of the other

20 individuals conducted everything at the residence. So I'm

21 unaware what took place there while we were gone. But, while I

22 was there, they were not talked to or questioned.

23 Q. And now just -- I know you went through what was found --

24 some of what was found or seized from the execution of that

25 warrant. One of the reports -- I can't remember if you

1  mentioned it -- said that -- I'm not going to be able to

2  pronounce this -- buprenorphine tablets were found in the home?

3  A.  Yes.  That's a prescription medication.  I don't recall

4  what it's for, but it is a non -- or a dangerous drug, not a

5  controlled substance, I believe.

6  Q.  It's used to treat opioid addiction, right?

7  A.  Yes.  That's right.  Sorry.  Yes, ma'am.  It's like

8  Suboxone, I believe.  Kind of something like that, yeah.

9  Q.  So -- and I have not seen the interview of my client yet,

10 but did investigators ask him as part of that interview if he

11 struggles with addiction to Percocets?

12 A.  He mentioned it at one point that he does use and that he

13 would sell to help fund that on occasion.  But, again, during

14 the interview, the story changed quite a bit from that to, no,

15 I just -- middle deals.  No, I didn't -- you know, it was very

16 inconsistent.  So at the point of the investigation we didn't

17 really have much to know other than the fact that a lot of the

18 information we were getting through the interview was false.

19 Q.  Is it -- this is a -- I don't know the exact ages of these

20 individuals, but is it generally correct that these individuals

21 that were working with Leander and Cedar Park, my client, these

22 are 18-, 19-, 20-year-olds?  They're very young -- young

23 adults?

24 A.  It varies quite a bit.  Some that cooperate are in theirs

25 40s, 50s, 60s.

1  Q.   Well, I'm talking about in this investigation.

2  A.   In this case, yeah, I want to say the oldest was around

3  that age, 18 to 20.  Something like that.

4  Q.   In the home when the warrant was executed, you did not

5  find a pill press or pill press equipment; is that right?

6  A.   Not to my knowledge.  No, ma'am.

7  Q.   And nothing in your investigation had suggested that

8  Mr. Soria Gamez is himself pressing or manufacturing pills?

9  A.   No, ma'am.  No.

10           MS. HERRING:  No further questions.  Thank you.

11           THE COURT:  Thank you, Ms. Herring.

12           Mr. Marshall?

13                    **REDIRECT EXAMINATION**

14  **BY MR. MARSHALL:**

15  Q.   Just for the record, Mr. Gamez isn't a pharmacist, is he?

16  A.   No, sir.

17  Q.   Nobody was saying, Hey, I've got a prescription.  Can you

18  give me some of these pills?

19  A.   No, sir.

20  Q.   These are all illicit drug sales?

21  A.   Yes.

22           MR. MARSHALL:  Pass the witness.

23           THE COURT:  Thank you.

24           MS. HERRING:  Nothing further, Your Honor.  Thank

25  you.

1          THE COURT:  Okay.  Thank you.  You may be excused,

2     Detective Fallon.

3          THE WITNESS:  Thank you, ma'am.

4          MR. MARSHALL:  No further witnesses, Your Honor.

5          THE COURT:  Thank you.  So we can proceed to -- I can

6     issue a finding at this time on the preliminary hearing unless

7     you want to proceed directly to the detention portion?

8          MR. MARSHALL:  We're pretty much going to offer the

9     same evidence for the detention portion.

10         THE COURT:  Yes, sir.  I assumed that Detective

11    Fallon's testimony would be considered for detention as well.

12         MR. MARSHALL:  Yes, ma'am.

13         MS. HERRING:  And that's fine with me, Your Honor.

14    We have no witnesses to present.

15         THE COURT:  Okay.  For the detention?

16         MS. HERRING:  Correct.

17         THE COURT:  Okay.  Thank you.  Then I'll just make a

18    finding at this time that the testimony of Agent Fallon and the

19    evidence presented by the government has been credible and

20    reliable, and there's sufficient credible and reliable evidence

21    to establish that the defendant, Juan Ignacio Soria Gamez, was

22    in possession with intent to distribute of a controlled

23    substance on at least February 22nd of this year and March 1st

24    of this year, as alleged in the complaint.

25         And this evidence is sufficient in nature to

1   establish that there's probable cause to believe that the

2   alleged charge in the complaint has been committed.  That is

3   the offense of possession with intent to distribute a

4   controlled substance, in violation of Title 21 of United States

5   Code Section 841(a)(1), and that the defendant, Mr. Soria

6   Gamez, has committed it.  Therefore, he'll be held to answer in

7   district court.

8           So we can proceed on to further proceedings at this

9   time with, I think, the government has anything further with

10  regard to the detention hearing or we'll turn to the defense.

11          MR. MARSHALL:  No further evidence.

12          THE COURT:  Thank you, sir.

13          Ms. Herring?

14          MS. HERRING:  We have no witnesses, Your Honor.  I

15  was just hoping to make argument on the detention point.

16          THE COURT:  Certainly.  We can proceed to argument.

17  Thank you.

18          MR. MARSHALL:  Okay.  The thing that's most

19  disturbing about this particular case is the fact that this

20  defendant knew what he was doing.  He knew he was distributing

21  controlled substance, whether he knew it was fentanyl or not,

22  that led to the deaths of people, that led to overdoses in this

23  particular case.  There is certainly probable cause to believe

24  that.

25          The testimony of the agent with regard to the first

two deaths, the fact the defendant went to the first decedent's

funeral, and then posted on Instagram saying "RIP" with a

handful of M30s is, at best, callous.  That aside, if he had

stopped right there, maybe we'd agree.  But the fact that he

went on and another individual bought dope from this man and

died, then he continued to sell dope that's dangerous and can

kill people -- two other overdoses are linked to it besides two

deaths -- the man presents a danger to the community.  The man

demonstrates that he has absolutely horrid judgment, if not

sociopathic judgment.

Excuse me.  My voice is going.

With regard to that, look at some of the posts he

made after the deaths.  "The feds are on my ass, but I'm still

making money."  My God.  Buy after buy after buy, consistent

buys.  And to answer one question, we didn't have the evidence

from the August death or the later death for the second

decedent.  We had to get it all subpoenaed and we had to put

all the evidence together, we had to get the social media, we

had to get the Cash App transactions.  We didn't get those

until January.  That's when we could put it all together.

After that came in, we could pretty well tie it up and we

started doing the controlled buys, two of which come back for

fentanyl.

The defendant was selling an incredibly dangerous

drug.  Despite the fact that he knew it was an incredibly

dangerous drug, he still kept selling.  Despite the fact that

he thought the feds were on him, he kept selling.  With all

that, he's playing with guns.  Don't even know where the guns

are.

Now, it indicates that the burden has shifted because

of the evidence in the pretrial services report, but the

pretrial services report indicates some employment.  The poll

cameras and the surveillance by the officers indicates no

employment.  They never saw him coming and going to a regular

job.  There's no evidence or documentation before the Court

that indicates he was coming and going to a regular job.

The evidence before the Court indicates this man's

regular job was selling fentanyl that kills people.  And, by

the way, it doesn't matter if he knew if it was fentanyl or

not.  If we can trace that substance from that defendant to a

decedent or to an overdose, you're guilty regardless of what's

in it.

With that evidence and with all the evidence before

the Court, it's obvious this man has incredibly poor judgment.

Government's 16, the photo of him after he's been confronted

with all this, is direct evidence of his attitude toward this

entire thing, towards the fact that he causes injuries and

deaths.

With that evidence, there's no set of conditions you

can set that you can believe he'll follow, because he

1   demonstrates incredibly, remarkably horrible judgment.

2           Thank you.

3           THE COURT:  Thank you, Mr. Marshall.

4           Ms. Herring?

5           MS. HERRING:  Yes, Your Honor.  The government's

6   argument for detention I think is largely based on speculation

7   about what is in Mr. Soria Gamez's mind and how his limited

8   view of his actions reflect his feelings, the assumption that

9   smiling after arrest is -- makes him heartless or reflects his

10  attitude about what's going on instead of it being the nervous

11  reaction of a 19-year-old who has never been arrested before.

12          I believe the presumption has been rebutted in this

13  case on the pretrial service's report alone, and the government

14  has not met its burden to show that he is a risk of flight.  I

15  don't think the government is even arguing risk of flight in

16  this case.  I address that in my memo that I filed with the

17  Court, but I believe there's nothing to suggest and, indeed,

18  evidence has been put on today by the government in the

19  testimony of the officer who noted that he opened the door, he

20  did not flee, and he was arrested without incident.  So I --

21  I'm not going to address flight further unless the Court has

22  questions on that point specifically.

23          But the government has also not met its burden to

24  show that he's a danger to the community by clear and

25  convincing evidence in this case.  Not only does the Court have

1  the pretrial services report recommending release, Mr. Gamez's

2  mother is here in the courtroom today in the back.  She is

3  willing to act as a third-party custodian.  She works for a

4  state agency.  She has held that job for a long time.  She's a

5  responsible adult and lives in a home, and he can live in that

6  home.  There are no firearms in that home.  She's brought his

7  passport to turn over to the court today.

8         I've also provided the Court with a letter reflecting

9  that he has employment and, indeed, has an employment option

10  with a construction company.  That's someone who can pick him

11  up.  His father also works for that company.  And, in speaking

12  with his mother, I can proffer this but if the Court has

13  questions for her, their plan is that he will be with his

14  father when he's working and with his mother when he's at home.

15  And so he will have direct supervision of a parent at all times

16  if he's released on bond in this case.

17         I also learned that Mr. Gamez has an older brother

18  who's in the military.  He's on leave for a month and is coming

19  home, and the family believes having the older brother present

20  will be another positive, motivating factor for Mr. Gamez to

21  follow any conditions the Court wishes to set.

22         Mr. Gamez, again, as I've presented proof to the

23  court, has been a student at Texas State.  He has the option to

24  return to college, and he wants to do that.  His plan would be

25  to do that if he's released on conditions as a way to fill his

1  time.  The only reason he took a pause from his studies was to

2  gather finances to continue them.  But he, you know, has done

3  one year at Texas State and wants to keep pursuing his -- his

4  education.

5          He's someone with no criminal history.  He's very

6  young.  He's never had an interaction with law enforcement

7  prior to this case.  He's never had to have a lawyer before.

8  You know, in my time meeting with him so far, he's spent a

9  whole weekend detained with individuals with much more

10  significant criminal history.  I think he is taking this quite

11  seriously at this point.  And we've had many discussions, and I

12  know he's had discussions with his mother, about what it means

13  to be released and how serious this case is.  And he -- he

14  understands that.

15          I understand that there are very sad and disturbing

16  facts as part of this investigation; that individuals have

17  died; that young men like Mr. Gamez, people he knew, have

18  passed away; and that the government, the DEA, rightly, is

19  pursuing what is a very dangerous drug in our community.

20          But I think the case law that I've referenced in the

21  memo suggests that just the continued risk of drug trafficking,

22  just because this is a serious case, under the Bail Reform Act

23  is not a reason to detain Mr. Gamez.  He is presumed innocent

24  at this point.  He has a right to fight this case, to work with

25  his attorney, and there's no reason that he can't do that at

1    home with conditions that the Court deems appropriate.

2            And so I would ask the Court to adopt the conditions

3    in the pretrial -- or recommended in the pretrial services

4    report.  I'm happy to speak to individual ones specifically, if

5    the Court has other ideas, but I believe this is a case in

6    which conditions can be set and we would ask for release.

7            THE COURT:  Thank you, Ms. Herring, and I'm sure you

8    have other things you want to say, Mr. Marshall, but I do not

9    have the detention motion in front of me and I believe the

10   government did check the box for flight risk.  And, as

11   Ms. Herring points out, we have been focusing on danger to the

12   community today.  And is the government pursuing detention on

13   the basis of flight risk, because that is something I'd like to

14   explore?

15           MR. MARSHALL:  On both bases, Your Honor.  The

16   defendant has ties with Mexico.  He's got a father from Mexico.

17   I think he's a grandparent.  He admits he's traveled to Mexico.

18   And, again, the same cases Ms. Herring cites to the Court

19   indicate, while continuing activity may not be an issue, it's

20   the judgment of the defendant and the behavior of the defendant

21   when confronted with what they've done or had been doing that's

22   relevant to the Court.

23           In other words, is he making good choices?  Is he

24   able to comply with conditions?  As I indicated earlier, I

25   think the answer is no.  He's impulsive.  He's reckless.  He

1    doesn't care.  That's the demonstration.  I'm not tying to

2    predict what's in his mind right now.  I have no clue.  No one

3    here does.  But the best predictor of future behavior is past

4    behavior, and his past behavior over the past year is

5    abhorrent, absolutely abhorrent, and that cannot be trusted by

6    a court on someone for which conditions should be set and a

7    bond for either complying and sticking around or presenting a

8    danger to the community.  He knew he presented a danger to the

9    community.  He kept doing it.

10             THE COURT:  Thank you, Mr. Marshall.

11             And, Ms. Herring, since the government, I believe,

12   did -- did check the box and is proceeding on risk of flight as

13   well, that is a significant concern to me that I'd like to hear

14   more about, given the defendant's ties to Mexico.  And his

15   father's not here today; is that correct?

16             MS. HERRING:  His father is not here, Your Honor.  So

17   I quoted a case for the Court that states that mere family ties

18   to Mexico are not sufficient evidence of risk of flight.  I

19   think we live in a state where a large percentage of people in

20   our state and citizens of our state have family in Mexico.

21   We're in Texas.  He until recently was a minor child and

22   visited extended family in Mexico with his parents.

23             We haven't heard specifics about trips.  I -- I am

24   unaware of the last time he took a trip.  I don't think law

25   enforcement pursued that as part of its investigation.  We

1  didn't hear any testimony about trips to Mexico in the last

2  year.  But I think that turning over the passport to the Court,

3  which his mother is prepared to do today, would address any --

4  any concern the Court has about flight.

5         THE COURT:  Well, it doesn't address all of my

6  concern, because it's not just that the defendant has family in

7  Mexico and has visited them there.  His father's a citizen of

8  Mexico.  So what I'm hearing is that he would be splitting --

9  he would be with his mom at night and with his dad during the

10 day.  But I -- I don't have -- have any indication that that's,

11 you know, going to keep him here.

12        I mean, there is nothing that I can do if he decides

13 to abscond to Mexico, whether it be location monitoring or

14 anything like that.  I can't -- I can't control that for

15 somebody who has these significant ties to Mexico.

16        MS. HERRING:  Well, I -- I don't agree that they're

17 significant, because we have not been presented -- the Court

18 has not been given any evidence about frequency of travel to

19 Mexico, any need for him to be in Mexico.  I don't believe he

20 has a need to be in Mexico.

21        THE COURT:  Well, he's apparently going to be

22 splitting his time with his two parents, one of whom is a

23 citizen of Mexico.

24        MS. HERRING:  That was a -- that is a proposal to the

25 Court.  If the Court is not comfortable with that and wants to

1  prohibit a 19-year-old from seeing his father based on his

2  father's immigration status, the Court can certainly set that

3  as a condition.  I think that would be something I've never

4  seen -- seen before.  But, you know, I'm -- I don't believe

5  that my client should be detained because his father is a

6  citizen of Mexico or because his father's immigration status is

7  a question for the Court.

8         My client is a United States citizen.  He will turn

9  over his passport to the Court.  He has no need to be in

10  Mexico.  And he can sign, and his mother can sign as

11  third-party custodian, that he will not be traveling outside of

12  any restriction that the Court sets.

13         I think, depending on the Court's concern, he could

14  be placed on a monitor.  Those do provide -- I've had many a

15  client on an ankle monitor -- provide immediate alerts if the

16  person is outside the zone where the monitor is set.  So I

17  think that would be a way to provide added assurance that he's

18  not traveling outside of the county.  The Court could also

19  place him on home detention, which would mean he would be at

20  his mother's home absent employment, approved by pretrial

21  services.  If pretrial is not comfortable with him working with

22  his father or family, I think that would be another condition

23  the Court could set that would address concerns about flight.

24         THE COURT:  Well, certainly.  I mean, with all due

25  respect, Ms. Herring, at no time did I say that a 19-year-old

defendant should not see his father. What I'm looking for is a plan that will keep this defendant from both leaving, fleeing the country, which he has ample ability to do, and keep him from being a danger to the community.

And what we've got is his mom here, who I appreciate you being here, ma'am, and being willing to serve as a custodian, but we've heard a lot about the defendant possibly having addiction issues which fueled the alleged crimes. And the last time he tried to get treatment, she got him out almost immediately.

So I'm not sure that the -- that the mom alone -- ma'am, and I'm sorry, I don't have your name in front of me -- is able to control and keep safe both this defendant, to keep him here and to control his -- the safety, his risk to the community. So those are the two things I'm looking at, is today, is there any sort of plan in place that's going to both prevent the defendant from being a flight risk and also alleviate the risk to the community. And that's what I'm hearing gaps in. That's what I'm having concerns with.

MS. HERRING: And I think I am struggling with addressing the specific concern. Because I think many of the recommended conditions restrict travel and movement when the Court sets conditions. So I think standard conditions, like restricting him to the typical five-county area or a smaller county area would be one way to address that, that he would

comply with, and that his mother and father would comply with.

Turning over the passport would be another standard condition

that he and his mother are willing to comply with.

If the Court wishes to place restrictions on

employment or on home detention, I think that would be a plan

that he's willing to comply with, a monitor. I think these are

all things the Court can choose from. And Mr. Gamez and his

mother, who I've spoken to, are willing to accept any condition

the Court is comfortable with for his release.

So if there's -- I don't know how to offer a more

specific plan without knowing what conditions the Court feels

are inadequate that it has at its disposal at this juncture.

THE COURT: Well, specifically, the proposal to be

spending his days with his father at work is one aspect of it,

if that's the plan.

MS. HERRING: May I have just a moment?

THE COURT: Certainly. And it's Ms. Martinez,

correct? Thank you. I have -- now I do have your name in

front of me.

But hold on. Let Ms. Herring answer.

MS. HERRING: Your Honor, Mr. Gamez has conveyed to

me that, if the Court is not comfortable with the proposed

employment, he can seek employment at H-E-B. He can look for a

different job. He doesn't need to work with his father. He's

happy to look for other employment that would alleviate that

1  concern.

2          THE COURT:  Okay.  Thank you, Ms. Herring.

3          Mr. Marshall had something that he wanted to add, but

4  I'm certainly willing to hear from Ms. Herring further as well.

5          MR. MARSHALL:  No.  If there's anything else, go

6  ahead.

7          THE COURT:  Okay.

8          MR. MARSHALL:  But, again, we come back to it's all

9  based on this man's decision-making.  Do you trust that?  And

10 based on the evidence before the Court, no.  The answer is no.

11 He makes horrible, bad, irrational judgments even when he has

12 facts presented to him.

13         You know, we all have standard conditions we live by.

14 One of them is don't violate the law.  One of the first things

15 you can look at under 3153 is what's the status of the case?

16 Is it a good case? a bad case? a strong case? a weak case?

17 This is a strong case.  It's a strong case that indicates he

18 caused death, at least probable cause, right now.  That's 20 to

19 life.

20         Unfortunately, we're looking at a bunch of 17-, 18-,

21 19-, and 20-year-olds that the Court has seen on frequent bases

22 that are engaged in this activity.  It's unfortunate, but

23 that's what's going on, and they're making the same kind of

24 horrible decisions this man's made.

25         There's nothing before the Court, there's no

1  condition you can set, that's going to guarantee safety of the

2  community or the fact that he won't flee.  Ankle monitors are

3  great.  They're a great way to see what happened after the

4  fact.  Taking away somebody's passport is great.  But if that's

5  all it took, we wouldn't have a crisis on the border.  It all

6  comes down to:  Will this man keep his word, and what has his

7  past performance shown?

8          THE COURT:  Thank you, Mr. Marshall.

9          Ms. Herring, is there anything further you'd like to

10  address?

11          MS. HERRING:  Yes, Your Honor.  The Bail Reform Act

12  doesn't require the Court to guarantee the safety of the

13  community.  The Court has to set conditions or can set

14  conditions to reasonably assure the safety of the community.

15  And based on that standard, I believe the Court, and I would

16  ask the Court, to set conditions.

17          The other thing that has been intervening since the

18  alleged behavior and where we are today is the fact of this

19  arrest, an arrest by, as Detective Fallon testified, many

20  officers showing up at his door.  Mr. Gamez at 19 has never

21  experienced this before.  He's never had contact with law

22  enforcement before.

23          And I believe, and it's our position, that that --

24  that he should be given the opportunity now with conditions in

25  place to respond to what is a very serious case.  And he should

1  at least have the opportunity to show the Court that he can

2  comply with conditions and allow him to continue to work with

3  me as we pursue resolution of this case going forward.

4         And that's all I have, Your Honor.

5         THE COURT:  Okay.  Thank you, Ms. Herring.  So the

6  court will take a recess.  I'll ask Ms. Stubbs from pretrial to

7  meet with me in my chambers.  We'll take a recess and be back

8  in a few minutes.

9    (Recess from 3:15 to 3:37 p.m.)

10        THE COURT:  I'd like to start out by thanking counsel

11  for their very able arguments today and thank Ms. Martinez for

12  being here to support her son.  And I'm going to begin --

13  before I announce my ruling, I'm going to let you know what

14  principles the court is guided by today.

15        And first is that the defendant is entitled to a

16  presumption of innocence at all times.  Under the Bail Reform

17  Act, pretrial detention is an exceptional step, and a defendant

18  must be released before trial unless I find that no combination

19  of conditions, or conditions standing alone, exist that will

20  reasonably assure the appearance of the defendant, if the

21  government seeks detention based on flight, which it would have

22  to prove by a preponderance of the evidence, or if I find that

23  no condition or combination of conditions exist that will

24  reasonably assure the safety of any other person in the

25  community, which the government would have to show by clear and

convincing evidence if it seeks detention on that basis.  And
the government seeks detention based on both here.

As Ms. Herring ably pointed out, I wanted to
emphasize that the standard is reasonably assure, not
guarantee.  The Act requires that the least restrictive
conditions be imposed that are necessary to provide the
reasonable assurances.  And if I can't find any condition or
combination of conditions that will reasonably appear *[sic]* the
appearance of the defendant nor the safety of the persons in
community, then I'm required by the Act to order the defendant
held in custody.

And as I believe Mr. Marshall mentioned during the
argument, there's a rebuttable presumption that applies in this
case.  I find that it does apply; that detention is needed
because the crime charged is a narcotics offense for which the
maximum penalty is 10 years or more.  I find that the defendant
has not offered sufficient evidence to rebut the presumption
based on the four factors that I'm required to consider.

I've considered all of the evidence on these factors
and the recommendation of pretrial services, which in this case
is release.  But the factors are the nature and circumstances
of the alleged offense.  And here, as I mentioned, I mean, this
case is a -- is a tragedy all around.  As Mr. Marshall argued,
the weight of the evidence against the defendant is strong.

The history and characteristics of the defendant is

the third factor. And, in particular, I'm influenced by the evidence concerns the defendant's past conduct, particularly over the past year.

And, finally, the nature and seriousness of the danger to others or to the -- or to the community, and that factor I find to be dispositive here. We've heard evidence of -- of two deaths and two overdoses, and the nature and seriousness of the danger to the community is quite high, therefore.

So based on the evidence, I find that the government has met its burden to show that detention is required based on danger to others in the community, and I'll be entering a written order of detention to that effect.

Is there anything further that the court needs to address at this time, Mr. Marshall?

MR. MARSHALL:  Not from the government.

THE COURT:  Thank you, sir.

And Ms. Herring?

MS. HERRING:  No, Your Honor.  Nothing further.

THE COURT:  Thank you once again, and the court's adjourned.

    (Proceedings concluded at 3:40 p.m.)

1                   **REPORTER'S CERTIFICATE**

2       I, Arlinda Rodriguez, do hereby certify that the foregoing

3  was transcribed from an electronic recording made at the time

4  of the aforesaid proceedings and is a correct transcript, to

5  the best of my ability, made from the proceedings in the

6  above-entitled matter, and that the transcript fees and format

7  comply with those prescribed by the Court and Judicial

8  Conference of the United States.

9

10  /S/ Arlinda Rodriguez            April 14, 2022

11  ARLINDA RODRIGUEZ               DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25